UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BRANDON A. PHILLIPS,

Plaintiff,

v.                                          CAUSE NO. 3:24-CV-45-PPS-JEM

RON NEAL, et al.,

Defendants.

<u>OPINION AND ORDER</u>

Brandon A. Phillips, a prisoner without a lawyer, filed an amended complaint as a matter of right under Federal Rule of Civil Procedure 15(a). (ECF 12.) This pleading supersedes his original complaint and controls the case from this point forward. *Mosley v. Indiana Dep't of Correction*, No. 22-2722, 2024 WL 1651902, at *1 (7th Cir. Apr. 17, 2024) ("[A]n amended complaint supersedes an original complaint and renders the original complaint void.").

In accordance with 28 U.S.C. § 1915A, I must screen his pleading and dismiss it if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. To proceed beyond the pleading stage, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Mr. Phillips is

proceeding without counsel, I must give his allegations liberal construction. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Mr. Phillips is an inmate at Indiana State Prison ("ISP"). As with his original complaint, he describes a tragic set of events occurring on or about January 14, 2023, when a fire broke out in cell A252 on the north side of A cellhouse.[1] Mr. Phillips was living on the south side of A cellhouse at this time, but he began to smell smoke. His cell door was left open by staff because he was a "prisoner-worker," and so he left his cell to find out what was happening. He "ran to the north side" of the cellhouse after being unable to locate any staff on the south side. When he entered the area, he heard inmates on the north side yelling that cell A252 was on fire. He then saw Sergeant Jeniene Walton, Officer Darnell Crockett, Officer Kevin Cross, and Lieutenant Nadine Smith and told them that the south side inmates needed to be evacuated, but Sergeant Walton allegedly responded that they were "dealing with something" and to sit down. He claims he has chronic illnesses, including high blood pressure, anxiety, and panic attacks, which were being triggered by the smoke. He asked the officers to take him to the medical unit, but they allegedly ignored him. He claims the officers were running around frantically trying to find a working fire extinguisher (without success) and to open the door to cell A252, but the door had warped due to the heat. He claims Sergeant Walton was "screaming in an incoherent panic" as they tried to open the cell

---

[1] Mr. Phillips's case is one of approximately 20 cases filed by inmates living in A cellhouse at the time of the fire. I note that he did not provide the first names of some of the defendants, but I will take judicial notice of the appearance they filed, which lists their first and last names. (ECF 13, 15.) I additionally note that Mr. Phillips misidentified Lieutenant Koen as "Lieutenant Cain" in his original complaint, but his amended complaint corrects this error.

door and put out the fire. Inmates on the north side of the cellhouse were demanding to be let out of their cells, but the officers continued their efforts to open the door of the cell that was on fire. One of the officers yelled for inmates to put on their COVID masks to protect them from the smoke. Regrettably, the inmate in cell A252 died before the fire could be put out.

After the fire was extinguished, the officers "were authorized by someone" to begin letting inmates out of their cells. Mr. Phillips "immediately ran outside to get fresh air." Lieutenant Dennis Koen and Jacqueline Mayes[2] were directing inmates to an outdoor recreation area, and Mr. Phillips told them he was a "chronic care patient" and needed medical care. He claims their response was that he should "just go to rec." He and the other inmates remained in the recreation yard for approximately six hours while the officers conducted a count of inmates in the cellhouse. He repeated his requests for medical care to Officer Cross, Officer Crockett, Sergeant Walton, Lieutenant Koen, Ms. Mayes, and Lieutenant Smith while he was in the recreation yard, but they did not take steps to get him care. He claims Ms. Mayes in particular was "rude" to him, telling him that "she was dealing with a lot of shit right now and that the world did not revolve around [him]." He and the other inmates were ultimately returned to their cells without receiving any medical attention.

After they returned to their cells, Dr. Christina Chico, a mental health provider at the prison, walked through the unit to do a "mental health check." He claims he told

---

[2] He does not include Ms. Mayes' title or explain her role at the prison.

Dr. Chico he needed medical care for breathing difficulties and other symptoms of smoke inhalation, but she told him it "was not her job to offer medical/health care." He claims she did not notify anyone that he needed health care either. Over the next several hours, he repeated to Officer Cross, Officer Crockett, Sergeant Walton, Ms. Mayes, Lieutenant Koen, and Lieutenant Smith that he needed medical care, but they allegedly took no steps to help him.

Approximately 13 hours after the fire, there was a shift change and a non-party officer took him to the medical unit. He was seen by Nurse Irasema Hernandez. He reported to her that he had been in the area of the fire and was having chest pain and other symptoms. She checked his blood pressure, oxygen level, and temperature, and informed him that his oxygen level was low and his blood pressure was "sky high." She left the room to call the doctor, and when she returned she gave him a dose of blood pressure medication and told him to "sit tight until that kicks in." He told her he was having difficulty breathing, and she allegedly told him he should "stop being such a big baby" and needed to wait for the blood pressure medicine to "d[o] its job." After approximately 90 minutes, Nurse Hernandez told him he was "good to go." He told her he was still having breathing problems and felt like he was having a panic attack. She gave him steroid pills that had been approved by the doctor, telling him that the pills "would deal with the breathing issues [he] was having." She also told him that he would be scheduled for a chest x-ray in the next few days and then sent him back to his cell.

He claims he later received a copy of the medical records from this visit and the time was listed wrong, which led him to believe there was a "cover-up" going on, so he stopped asking for medical treatment "for fear of retaliation." He claims that to this day he "randomly" suffers physical symptoms from the fire, burning sensations within his sinuses, including shortness of breath, headaches, and an inability to "run … distances" or "enjoy the quality of life" he had prior to the fire. He also claims to suffer from night terrors, difficulty sleeping, and other psychological injuries from having witnessed the other inmate die in the fire. Based on these events, he seeks $1 million in compensatory damages against each defendant and an award of punitive damages from fourteen defendants.

### <u>Response To Fire</u>

Mr. Phillips first alleges claims against the officers who responded to the fire: Officer Cross, Lieutenant Smith, Officer Crockett, and Sergeant Walton. Under the Eighth Amendment, prisoners cannot be subjected to cruel and unusual punishment. *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). In evaluating an Eighth Amendment claim, courts conduct both an objective and a subjective inquiry. *Id.* at 834. The objective prong asks whether the alleged deprivation or condition of confinement is "sufficiently serious" that a prison employee's act or omission resulted in "the denial of the minimal civilized measure of life's necessities." *Id.* (cleaned up). On the subjective prong, the prisoner must allege that the defendant acted with "deliberate indifference" to his health or safety. *Id.* This is a high standard because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Burton v. Downey*, 803 F.3d 776,

785 (7th Cir. 2015). "[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). Instead, the inmate must allege "a culpability standard akin to criminal recklessness." *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021).

The circumstances Mr. Phillips describes are disturbing, but his allegations that the officers were "unprepared" and acted "incompetently" in responding to the fire suggest negligence, not deliberate indifference. He intimates that there was some delay in their response, but it is evident from his allegations that he was on the opposite side of the cellhouse when the fire first broke out; I cannot plausibly infer from what he has alleged that these officers knew there was a fire and deliberately turned a blind eye to inmates' safety. *See LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020) (to be deliberately indifferent prison employee "must have actual, not merely constructive" notice of the risk of harm). By his account, when he arrived on the north side of the cellhouse the officers were frantically attempting to open the door of the cell that was on fire, albeit unsuccessfully. It can also be discerned from his allegations that their efforts were hampered by factors beyond their control, including the lack of working fire extinguishers and cell doors that could not properly withstand heat.

He claims they should have evacuated him and the other inmates immediately when he notified them there was smoke on the south side of the cellhouse, and also should have gotten him immediate medical attention when he requested it because he has chronic health conditions. However, it is clear that in those frantic moments the officers focused their efforts on getting inside the cell that was on fire. This may not

have been the best approach, but "the mere failure . . . to choose the best course of action does not amount to a constitutional violation." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). He has not plausibly alleged that the officers acted with a mental state akin to criminal recklessness in responding to the fire.

The circumstances he describes might suggest negligence, and he expressly states that he is pursuing claims for negligence and negligent infliction of emotional distress under Indiana law. However, his state law claims trigger application of the Indiana Tort Claims Act. IND. CODE § 34-13-3 *et seq.* The Tort Claims Act prohibits tort suits against government employees personally for conduct within the scope of their employment. *See* IND. CODE § 34-13-3-5(b); *see also Katz-Crank v. Haskett*, 843 F.3d 641, 648 (7th Cir. 2016) ("[T]he Indiana Tort Claims Act confers on public employees a broad immunity from suit for acts committed within the scope of their employment."); *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014) ("Under the Indiana Tort Claims Act, there is no remedy against the individual employee so long as he was acting within the scope of his employment."). "If an alleged action is within the general scope of an individual's authority, it is authorized within the meaning of the Tort Claims Act, regardless of whether it was done negligently or with improper motive." *Reiner v. Dandurand*, 33 F. Supp. 3d 1018, 1032 (N.D. Ind. 2014) (cleaned up). It is clear from the amended complaint that these defendants were acting within the scope of their employment as correctional officers when they responded to the fire. Under state law, they are shielded from personal liability. *Ball*, 760 F.3d at 645.

The Tort Claims Act permits a litigant to sue the individual's employer, which in this instance would be the Indiana Department of Correction ("IDOC"). IND. CODE § 34-13-3-5. Mr. Phillips does not name the IDOC as a defendant, but he does name IDOC Commissioner Reagle in her official capacity, which is the same thing. *See Fritz v. Evers*, 907 F.3d 531, 533 (7th Cir. 2018) ("[A] state official (in his official capacity) *is* the state."). However, in federal court, states and their agencies enjoy Eleventh Amendment immunity. *Burrus v. State Lottery Comm'n of Ind.*, 546 F.3d 417, 420 (7th Cir. 2008) ("[S]tate agencies, as arms of the state, are immune from suit under the Eleventh Amendment."). Therefore, his allegations do not state a claim for relief.

## Denial of Medical Care

He next asserts claims against the responding officers, as well as Lieutenant Koen, Ms. Mayes, and Dr. Chico, for denying him medical care after the fire. Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To state a claim for the denial of this right, a prisoner must allege: (1) he had an objectively serious medical need; and (2) the defendant acted with deliberate indifference to that medical need. *Farmer*, 311 U.S. at 834. A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (citation omitted), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262,

267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id.*

Mr. Phillips claims to have been suffering from severe effects of smoke inhalation after the fire, including having difficulty breathing. He asserts that he reported his need for medical attention to each of these defendants and alerted them that he had chronic health conditions, but they allegedly brushed off his concerns. It was not unreasonable for the officers to initially focus on evacuating and taking count of the inmates in the cellhouse, but Mr. Phillips claims that no one took any steps to have him evaluated by medical staff even after the emergency was over. Although he was ultimately taken to the medical unit approximately 13 hours after the fire was extinguished, it appears this was done at the initiative of a non-party prison employee rather than any of the defendants. As for Dr. Chico, she is a mental health provider and may not have been equipped to treat injuries from smoke inhalation, but Mr. Phillips claims that instead of taking some step to assist him, such as contacting the medical unit on his behalf, she simply told him it wasn't her job. She knew there had just been a serious fire in which one inmate died, and her response could be considered deliberate indifference under these extreme circumstances. He has alleged enough to proceed further on a claim against Officer Cross, Lieutenant Smith, Officer Crockett, Sergeant Walton, Lieutenant Koen, Ms. Mayes, and Dr. Chico for the denial of medical care in violation of the Eighth Amendment.

He further claims that the care provided by Nurse Hernandez was inadequate. Courts generally "defer to medical professionals' treatment decisions unless there is

evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (cleaned up). This standard "reflects the reality that there is no single 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019). Mere disagreement between a prisoner and a medical professional does not state a claim for an Eighth Amendment violation. *Id.* at 1024.

Mr. Phillips' allegations reflect that Nurse Hernandez carried out her duties by assessing his condition, contacting the doctor, giving him the medications the doctor prescribed, and keeping him for observation to allow one of the medications to begin working. *See Brown v. Osmundson*, 38 F.4th 545, 553 (7th Cir. 2022) (no liability for prison nurse who "wrote down [the plaintiff's] symptoms, checked his vitals, relayed necessary information to [the doctor], and performed her assigned duties."); *Reck v. Wexford Health Sources*, Inc., 27 F.4th 473, 485 (7th Cir. 2022) ("As a general matter, a nurse can, and indeed must, defer to a treating physician's instructions."). Mr. Phillips believes she was rude and brusque in carrying out her duties, but this does not give rise to an Eighth Amendment claim.[3] *Lockett*, 937 F.3d at 1024; *see also Lisle v. Welborn*, 933 F.3d 705, 719 (7th Cir. 2019) ("Relationships between prisoners and prison staff are not

---

[3] To the extent he is trying to assert a malpractice claim against Nurse Hernandez under state law, there is no indication he presented a proposed complaint to a medical review panel and obtained an opinion from the panel before filing this action in compliance with Indiana's Medical Malpractice Act. *See* IND. CODE § 34-18-8-4; *see also Thompson v. Cope*, 900 F.3d 414, 424 (7th Cir. 2018) ("The medical review panel requirement is a substantive feature of the Act that must be enforced in federal court.").

always marked by genteel language and good manners."). He will not be permitted to proceed on a claim against Nurse Hernandez.

### High-Ranking Officials

Finally, he sues high-ranking officials for the circumstances leading to the fire: Commissioner Reagle, Warden Ron Neal, Assistant Warden Dawn Buss, Major Douglas Wardlow, and two unnamed defendants, the prison's safety hazard manager (herein "John Doe Safety Manager") and the prison's supervisor of fire training (herein "John Doe Fire Training Supervisor"). He argues that their actions and inaction effectively made the cells in the A cellhouse a "deathtrap." Among other things, he points to the following conditions: most of the fire extinguishers in the cellhouse were either empty or inoperable; there were few fire drills performed by staff or inmates; the cell doors had to be manually unlocked and could not withstand heat; there were no emergency call buttons inside the cells; and the cell walls contained layers and layers of paint, which provided fuel for a fire should one break out. He claims the officials were on notice of these conditions because of the more than 100 fires that had occurred at ISP prior to this one, which lead to a flurry of reports and in some cases litigation, and regular dormitory meetings in which concerns about fire-readiness were routinely raised by inmates.[4] He further claims these officials had the ability to alter these

---

[4] Another inmate at ISP died in a fire in 2017, resulting in a lawsuit by his estate. *Dwyer v. Neal, et al.*, No. 3:18-CV-995-JD (N.D. Ind. closed Sept. 12, 2023). Although that fire occurred in the B cellhouse, the presiding judge found evidence at the summary judgment stage that "fires were frequent at ISP," that "fire safety at ISP was severely deficient in multiple areas," and that inspections of fire safety equipment at the facility "were not being performed in any meaningful manner." *Id.*, ECF 234 at 28, 32. The case ultimately settled out of court before trial. *Id.*, ECF 304-307.

conditions or move inmates out of that area, and yet they allegedly did nothing to protect them.

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832-33. To establish an Eighth Amendment violation, an inmate must show that a defendant was deliberately indifferent to "an excessive risk" to his health or safety. *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018). Proving this requires satisfying two components: "(1) the harm to which the prisoner was exposed must be an objectively serious one; and (2) judged subjectively, the prison official must have actual, and not merely constructive, knowledge of the risk." *Id.* (cleaned up). On the second prong, the plaintiff must establish that "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (citation omitted).

Mr. Phillips states that he is suing these officials in both their official and personal capacity. However, suing a state official in his or her official capacity is the same as suing the state, *Fritz*, 907 F.3d at 533, and a state is not a "person" that can be sued for constitutional violations under 42 U.S.C. § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989). Additionally, a claim for damages against the state is barred by the Eleventh Amendment in federal court. *Burrus*, 546 F.3d at 420.

That leaves the possibility of suing these officials in their personal capacity. There is no general *respondeat superior* liability under 42 U.S.C. § 1983, and these officials

cannot be held liable for damages simply because they oversee operations at the prison or within the IDOC. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018); *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). However, they may be held liable if they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir 2019) (citation omitted). Additionally, "[i]ndividual defendants . . . who are responsible for setting prison policy, can be held liable for a constitutional violation if they are aware of a systemic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy." *Sinn*, 911 F.3d at 423. Knowledge may reasonably be inferred when a condition is so pervasive that high-ranking officials were "bound to have noticed" it. *Smith v. Sangamon Cty. Sheriff's Dep't*, 715 F.3d 188, 192 (7th Cir. 2013).

Giving Mr. Phillips the inferences to which is entitled at this stage, he has plausibly alleged that these officials were aware of the serious danger posed by fire in the A cellhouse because of the conditions and omissions he outlines, and yet they failed to take any steps to keep inmates safe. As a result, he suffered physical and emotional injuries. He has alleged enough to proceed further on a claim for damages against these officials under the Eighth Amendment.

As to the two John Doe defendants, it is permissible to sue a "placeholder defendant" in federal court, but as a practical matter an unnamed defendant cannot be served with process. *See Rodriguez v. McCloughen*, 49 F.4th 1120, 1121 (7th Cir. 2022). These defendants must be identified and served within the two-year statute of limitations period and the deadline specified in Federal Rule of Civil Procedure 4(m). *Id.*

I have an obligation to assist Mr. Phillips in trying to identify and serve these defendants. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996); *Sellers v. United States*, 902 F.2d 598, 602 (7th Cir. 1990). To aid in this process, I will order Warden Neal to provide identifying information about these defendants as outlined below.

For these reasons, the court:

(1) GRANTS the plaintiff leave to proceed against Officer Cross, Lieutenant Smith, Officer Crockett, Sergeant Walton, Lieutenant Koen, Ms. Mayes, and Dr. Chico in their personal capacity for money damages for denying him medical care for injuries he suffered in a January 2023 fire in violation of the Eighth Amendment;

(2) GRANTS the plaintiff leave to proceed against Commissioner Reagle, Warden Ron Neal, Assistant Warden Dawn Buss, Major Douglas Wardlow, John Doe Safety Manager, and John Doe Fire Training Supervisor in their personal capacity for monetary damages for deliberate indifference to the risk of harm posed by a fire that occurred in January 2023 in violation of the Eighth Amendment;

(3) DISMISSES all other claims;

(4) ORDERS Warden Ron Neal, Commissioner Christina Reagle, Jacqueline Mayes, Lieutenant Dennis Koen, Officer Darnell Crockett, Lieutenant Nadine Smith, Sergeant Jeniene Walton, Officer Kevin Cross, Assistant Warden Dawn Buss, Major Douglas Wardlow, and Dr. Christina Chico to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order on or before **June 11, 2024**; and

14

(5) ORDERS Warden Ron Neal to provide on or before **June 11, 2024**, the names of the individuals who served as Indiana State Prison's Safety Hazard Manager and Supervisor of Fire Training as of January 2023, or to file a notice by this date explaining why the names of these individuals cannot be provided.

SO ORDERED on May 8, 2024

s/ Philip P. Simon
JUDGE
UNITED STATES DISTRICT COURT