UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| BRANDON A. PHILLIPS, SR.,<br><br>Plaintiff,<br><br>v.<br><br>RON NEAL, et al.,<br><br>Defendants. | CAUSE NO. 3:24-CV-45-PPS |

OPINION AND ORDER

Brandon A. Phillips, a prisoner without a lawyer, brings two claims related to a fire that occurred at Indiana State Prison ("ISP") on January 14, 2023. First, he is proceeding against Officer Kevin Cross, Lieutenant Nadine Smith-Robinson, Officer Darnell Crockett, Sergeant Jeniene Walton, Lieutenant Dennis Koen, Case Worker Jacqueline Mayes, and Dr. Christina Chico "in their personal capacity for money damages for denying him medical care for injuries he suffered in a January 2023 fire in violation of the Eighth Amendment[.]" ECF 8 at 11. Second, he is proceeding against Commissioner Christina Reagle, Warden Ron Neal, Assistant Warden Dawn Buss, Major Douglas Wardlow, Supervisor of Fire Training Gordon Beecher, and Safety Hazard Manager Deborah Taylor "in their personal capacity for monetary damages for deliberate indifference to the risk of harm posed by a fire that occurred in January 2023 in violation of the Eighth Amendment[.]" *Id*. For simplicity's sake, I will refer to these defendants collectively as the "state defendants". The state defendants filed a joint motion for summary judgment, which is fully briefed. ECF 131, 132, 139, 142, 147, 148-1,

162, 164, 171. The remaining defendant, Dr. Chico, filed a separate motion for summary judgment, which is likewise fully briefed. ECF 134, 135, 136, 137, 145, 146, 151, 152, 159.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). I will not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). My sole task at this stage of the case is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770. If a reasonable factfinder could find in favor of the nonmoving party, summary judgment may not be granted. *Id.*

I will address the state defendants' summary judgment motion first and then turn to Dr. Chico's summary judgment motion.

## I. State Defendants

Phillips is proceeding against the state defendants on two claims. First, he is proceeding against one group of state defendants who were physically present for and actively involved in responding to the January 14 fire – Officer Cross, Lt. Smith-Robinson, Officer Crockett, Sgt. Walton, Lt. Koen, and Case Worker Mayes (collectively, the "incident defendants") – for denying him medical care for injuries he suffered during the January 14 fire. ECF 8 at 11. Second, he is proceeding against another group of state defendants who are supervisory officials at ISP – Commissioner Reagle, Warden Neal, Assistant Warden Buss, Major Wardlow, Supervisor of Fire Training Beecher, and Safety Hazard Manager Taylor (collectively, the "supervisory defendants") – for deliberate indifference to the risk of fire at ISP. Each claim will be addressed in turn.

### *a. Incident Defendants*

Phillips is proceeding against the incident defendants for denying him medical care for injuries he suffered during the January 14 fire. Viewed in the light most favorable to Phillips, the evidence shows the following facts:

During all relevant times, Phillips was living in Cell 347, a single-man cell on the third floor of the south side of A Cellhouse (ACH). ECF 132-1 at 19. Around 11:00 a.m. on January 14, 2023, a fire started in cell A252, on the north side of ACH. ECF 96-1 at 22. The individual who lived in cell 252 was Michael Smith. *Id.* Phillips began to see smoke and heard "everyone on the north side of the cell house" screaming, but could not see the source of the fire from his cell. ECF 132-1 at 40-41.

At around 10:58 a.m., prison staff heard the fire alarm in ACH go off and inmates yelling, prompting them to respond. ECF 132-11 at 2. Sgt. Walton called a 10-71, which is the signal for a fire in ACH. ECF 132-11 at 2; ECF 90 at 5. Officer Cross grabbed a fire extinguisher from the officer's station, and he and Officer Crockett went to the 200 North range with the fire extinguisher and the keys to the range. ECF 132-3 at 3; ECF 132-11 at 2. Once they were on the 200 range, they realized the location and size of the fire. *Id.* They proceeded to Cell A252, but it was hard to get near the front of the cell to manually unlock the door because of the intensity of the fire. *Id.* Officer Cross used the fire extinguisher but it was not able to put out the fire. ECF 132-3 at 3. Officer Cross had unknowingly grabbed a water-based fire extinguisher, and realized he needed an ABC fire extinguisher instead. *Id.*

Officer Cross then quickly went back downstairs and met Lt. Smith-Robinson, who handed him an ABC fire extinguisher. ECF 132-3 at 3; ECF 132-4 at 2. At approximately 10:59 a.m., Officer Cross returned to Cell A252 with the ABC fire extinguisher and passed it to Officer Crockett, who deployed it to control the fire. ECF 132-11 at 2; ECF 132-3 at 3. First responders arrived on the scene, including Lt. Koen. ECF 132-11 at 2; ECF 132-5 at 2. Lt. Koen was able to open the door to Cell A252 as staff continued to try to put out the fire. ECF 132-11 at 2-3; ECF 132-5 at 2. The inmate firefighters arrived on the scene and were able to extinguish the fire. ECF 132-11 at 3.

While the fire was ongoing, Phillips testified that he "blacked out" and "hit [his] head against the wall." ECF 132-1 at 45. He does not know how long he was unconscious and recalls regaining consciousness when he heard the bar to his range

roll. *Id*. While in his cell, he experienced dizziness, burning eyes, anxiety, panic attacks, and difficulty breathing. *Id*. at 52, 59.

Once the inmate firefighters arrived and began extinguishing the fire, Captain McCann authorized the evacuation of the remaining inmates in ACH. ECF 132-4 at 2; ECF 132-11 at 3. Correctional officers unlocked the cells and swept each range. ECF 132-4 at 2. Either Officer Cross or Officer Crockett rolled the bar to Phillips' range, allowing him to leave his cell. ECF 132-1 at 44. Phillips then took the back stairs and exited ACH through the front door. *Id*. at 47-49. He did not see or speak with any correctional staff while he was leaving the cellhouse. *Id*. at 50.

Once outside, Phillips saw Officers Cross and Crockett gasping for air with water bottles over their faces. ECF 132-1 at 55, 60. He told them he needed immediate medical attention because he had "sustained injuries" and was lightheaded. *Id*. In response, they told him to get away from the building and guided him toward Lt. Koen and Case Worker Mayes. *Id*. Phillips then told Lt. Koen that he was having difficulty breathing, was dizzy, and had burning eyes, but Lt. Koen walked away without responding. *Id*. at 61-62. Phillips then asked Case Worker Mayes for medical attention; she told him they were "not dealing with medical right now" and directed him to continue to the recreation yard. *Id*. at 62. According to Lt. Koen, any inmate who appeared to be experiencing a medical emergency was taken directly to the medical unit, while the other inmates were escorted to the recreation yard. ECF 132-5 at 3.

While proceeding to the recreation area, Phillips told Sgt. Walton and Lt. Smith-Robinson that he needed immediate medical attention because he was a chronic-care

patient and was experiencing dizziness, difficulty breathing from smoke inhalation, nausea, anxiety, and a panic attack. ECF 132-1 at 63-64. Once he arrived at the recreation area, he saw Case Worker Mayes conducting a count and believes he again told her that he needed medical attention. *Id*. at 65-67. He did not otherwise report his medical concerns to recreation staff. *Id.*

After ACH was cleared, the inmates were returned to their cells and placed on lockdown. ECF 132-3 at 4; ECF 132-4 at 2. On the way back to ACH, Phillips again told Lt. Smith-Robinson and Sgt. Walton that he needed medical attention and described his symptoms. ECF 132-1 at 71-72. They responded that they were not "dealing with that right now" because they were trying to secure the inmates back in the housing unit. *Id*. at 72. Lt. Koen attests that inmates who requested medical attention but did not appear to be experiencing an emergency were returned to their cells so staff could perform a triage and coordinate treatment with medical staff. ECF 132-5 at 3. This was obviously an emergency situation. There had been a fire in the prison, and the defendants were attempting to establish a reasonable, organized system to deal with it. Once back in his cell, Phillips continued to experience "blacking out, anxiety, and difficulty breathing." ECF 132-1 at 71. He again requested medical attention from Officer Cross while Officer Cross was "securing" the cells. *Id.* at 73. Officer Cross went downstairs, informed the sergeant on duty of the request, returned to Phillips' cell, and told him the sergeant had been notified. *Id.* at 73-74.

Phillips was seen by a medical provider at approximately 9:00 p.m. that day. ECF 132-1 at 74-75. He reported difficulty breathing, dizziness, and a bump on his head from

losing consciousness. *Id*. at 75. During the evaluation, Phillips stated that he felt as though his blood pressure was elevated and that he was about to have a heart attack. *Id*. at 75-76. The provider found his blood pressure was higher than normal and gave him Clonidine; Phillips ordinarily takes blood-pressure medication. *Id*. at 9, 75-77. The provider did not diagnose any condition or ailment related to the fire. *Id*.

As discussed, Phillips is proceeding against the incident defendants "for denying him medical care for injuries he suffered" during the January 14 fire. ECF 8 at 11. The incident defendants argue summary judgment is warranted in their favor on this claim because (1) Phillips did not suffer any objectively serious medical condition, (2) they were not deliberately indifferent to that condition, and (3) they are entitled to qualified immunity.

Under the Eighth Amendment, prison officials have a duty to ensure inmates receive constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability for an Eighth Amendment violation, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendants acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the second prong, Phillips must show the incident defendants "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks, brackets, and citations omitted). "Deliberate indifference occupies a space slightly below intent and poses a

'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)). The deliberate-indifference inquiry is subjective: the defendant must be aware of facts supporting an inference that a substantial risk of serious harm exists and must actually draw that inference. *See Farmer*, 511 U.S. at 837; *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024).

Here, Phillips testified that he personally requested medical attention from each incident defendant and described symptoms including lightheadedness, difficulty breathing, dizziness, burning eyes, nausea, anxiety, and a panic attack. ECF 132-1 at 55, 60-64, 71-74. At summary judgment, that testimony must be credited. The question is therefore not whether the incident defendants knew Phillips wanted medical attention, but whether their individual responses—and any resulting delay—permit a reasonable jury to find an Eighth Amendment violation.

Officers Cross and Crockett did not ignore Phillips' initial request for help. When Phillips told them outside ACH that he had sustained injuries and was lightheaded, they instructed him to move away from the building and directed him toward Lt. Koen and Case Worker Mayes. ECF 132-1 at 55, 60. And when Phillips later requested medical attention from Officer Cross after returning to his cell, Officer Cross went downstairs to notify the sergeant on duty and then returned to tell Phillips that he had relayed the request. *Id.* at 73-74. Those actions do not permit a reasonable jury to find that either officer exhibited "a total unconcern" for Phillips' welfare.

The same is true of Lt. Smith-Robinson and Sgt. Walton. Phillips told them while leaving ACH that he was a chronic-care patient and was experiencing dizziness, difficulty breathing from smoke inhalation, some nausea, anxiety, and a panic attack. ECF 132-1 at 63-64. He repeated his request while the inmates were being returned to ACH, and they told him they were not addressing medical requests at that moment because they were trying to secure the housing unit. *Id*. at 71-72. That response was consistent with the undisputed procedure of first securing inmates who did not appear to be experiencing a medical emergency and then conducting a triage to coordinate treatment. ECF 132-5 at 3. On this record, their decision to defer Phillips' request to that triage process does not satisfy the "high hurdle" required to show deliberate indifference.

Lt. Koen and Case Worker Mayes were less responsive, but the evidence still does not show the culpable state of mind required by the Eighth Amendment. Phillips told Lt. Koen during the evacuation that he was having difficulty breathing and experiencing dizziness and burning eyes, and Lt. Koen walked away without responding. ECF 132-1 at 61-62. Case Worker Mayes likewise told Phillips they were "not dealing with medical right now" and directed him to the gym; Phillips believes he repeated his request while she was performing a count. *Id*. at 62, 66-67. But there is no evidence that Phillips' condition outwardly appeared to require special emergency intervention rather than the triage process already in place. Under these circumstances, declining to interrupt the ongoing evacuation and count to personally secure immediate treatment does not, without more, show deliberate indifference.

More generally, the Eighth Amendment did not require the incident defendants to abandon their responsibilities during the ongoing fire response to personally secure immediate medical treatment each time Phillips requested it. The undisputed evidence shows that staff had a procedure under which inmates who appeared to be experiencing medical emergencies were taken directly to the medical unit, while other inmates requesting care were first secured in their cells and then triaged so that treatment could be coordinated. ECF 132-5 at 3. Nothing in the record suggests that Phillips outwardly appeared to be experiencing a medical emergency requiring the defendants to bypass that process. The incident defendants therefore did not act with deliberate indifference by continuing the evacuation, count, and securing of ACH and directing Phillips through the procedure established to address his medical needs. The Eighth Amendment did not require them to interrupt those responsibilities and personally arrange treatment at the precise moment Phillips requested it. See *Hayes v. Zatecky*, No. 1:21-CV-00630-JPH-KMB, 2023 WL 5722673, at *5 (S.D. Ind. Sept. 5, 2023) (administrators were not required to personally secure treatment for non-emergency complaints where the inmate could seek treatment through appropriate medical channels) (citing *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)); *Robertson v. Liedtke*, No. 3:23-CV-514-HAB, 2026 WL 274603, at *4-5 (N.D. Ind. Feb. 2, 2026).

The subsequent course of events likewise does not support an inference that the incident defendants simply abandoned Phillips' request for care. Staff had a process for identifying inmates who needed treatment after the emergency response, Officer Cross specifically relayed Phillips' request to the sergeant on duty after Phillips returned to

his cell, and Phillips was in fact evaluated by a medical provider at approximately 9:00 p.m. that same day. ECF 132-1 at 73-77; ECF 132-5 at 3. The record may support an inference that Phillips wanted and perhaps should have received medical attention sooner, but it does not support a reasonable inference that these defendants consciously chose to leave a known serious medical need untreated.

Moreover, to the extent Phillips' claim rests on the several-hour delay before he was evaluated, he has not produced medical evidence that the delay itself caused him additional harm. *See Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 833 (7th Cir. 2026) ("In cases such as this one—where the plaintiff alleges the defendant delayed, rather than denied, medical treatment—we have required that the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm."). When Phillips was seen that evening, the provider treated his elevated blood pressure with Clonidine but did not diagnose any other condition or ailment. ECF 132-1 at 75-77. Nothing in the record would permit a reasonable jury to find that receiving that evaluation earlier would have prevented additional injury or otherwise changed his medical outcome. *See Barnes*, 177 F.4th at 833; *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009).

Accordingly, even crediting Phillips' testimony that he directly informed each incident defendant of his symptoms and need for medical attention, the evidence does not permit a reasonable jury to find that any of them acted with deliberate indifference.

Summary judgment is therefore warranted in favor of the incident defendants on this claim.[1]

*b. Supervisory Defendants*

Phillips is proceeding against the supervisory defendants on a deliberate-indifference claim based on the risk of harm posed by the January 2023 fire. At the outset, there is no evidence that any of these defendants were present for or personally involved in responding to the January 14 fire. Rather, Phillips's claim concerns their conduct before the fire: he contends that they knew conditions in ACH created a substantial risk of serious harm in the event of a fire but failed to take reasonable measures to address that risk. *See* ECF 147-1 at 23 ("To be clear, I am not claiming that Supervisory Defendants are liable because they approved, condoned, or turned a blind eye to the actions taken by Incident Defendants on January 14, 2023. Rather, I am asserting an independent theory of deliberate indifference as to the Supervisory Defendants. Specifically, that they were aware of dangerous conditions in [ACH] and the substantial risk these conditions posed in an event of a fire, but that they failed to take reasonable action in response to this risk.").

The supervisory defendants submit affidavits from ISP Safety Hazard Manager Taylor and Warden Neal describing the fire-prevention and response measures in place at ISP at the time of the January 14 fire. They attest to the following facts:

[1] Because the record does not permit a reasonable jury to find the incident defendants liable for deliberate indifference, I do not reach their alternative arguments that Phillips did not have an objectively serious medical need or that they are entitled to qualified immunity.

ISP maintains its own on-site inmate fire department, whose members receive statewide firefighter certification and training through the State Fire Marshal, allowing the facility to respond to fires more quickly than if it had to wait for an outside fire department. ECF 132-7 at 2. ISP also equips its fire department with the latest firefighting and smoke-control equipment, including foam backpack fire-suppression systems and smoke-evacuation systems. *Id.* All fire alarms were operational at the time of the January 14 fire, several had been newly installed or refurbished, and the dampers and exhaust systems in the cellhouses were regularly repaired and replaced as needed to ensure they remained operational. *Id.*

ISP had also implemented additional fire-safety measures following a 2017 fire. It purchased additional water and ABC fire extinguishers, which were placed at officers' stations and on the endcaps of each cell range; reduced the amount of property inmates could keep in their cells; and replaced plastic property boxes with more fire-resistant steel boxes. ECF 132-7 at 2-3. The housing units themselves are primarily constructed of steel and concrete, and ISP uses fire-retardant mattresses. *Id.* at 4. In 2019, ISP also upgraded all of its fire hydrants. *Id.*

These measures were supplemented by regular inspection, training, and emergency-planning procedures. The ISP Fire Department conducted bimonthly inspections of all fire extinguishers, and there were no reports of inoperable or empty extinguishers in ACH leading up to the January 14 fire. ECF 132-7 at 4; ECF 132-8 at 2. The Safety Hazard Manager and ISP Fire Department also conducted four fire drills per year for each building. *Id*. Finally, ISP maintained a Fire Plan setting out staff

procedures for fire prevention and evacuation, and all staff received training on the plan and were required to complete a questionnaire testing their knowledge of those procedures. ECF 132-7 at 4-5; ECF 132-8 at 2.

All supervisory defendants attest they were unaware of any infrastructural issues or conditions at ISP that created a fire risk or threatened the lives of inmates living in ACH. ECF 132-2 at 1; ECF 132-7 at 6; ECF 132-8 at 4; ECF 132-9 at 3; ECF 132-10 at 2. The January 14 fire was investigated by both the State Fire Marshal and ISP's Internal Affairs Division, and neither party was able to determine the cause of the fire. ECF 132-7 at 7.

In his response, Phillips lists twenty-five conditions he contends made ACH unsafe and created a substantial risk of harm in the event of a fire: (1) no inmate firefighters were housed in ACH; (2) fire signals were not called promptly; (3) staff did not promptly release inmate firefighters to respond to fires; (4) electrical outlets were not grounded; (5) the smoke-ventilation exhaust system was inoperable; (6) fire extinguishers were either inoperable or insufficient in number; (7) staff were inadequately trained; (8) automatic smoke alarms were inoperable; (9) the paint was flammable; (10) staff training was deficient; (11) cells lacked emergency call buttons; (12) staff did not perform timely security checks; (13) cells had double-locking manual doors; (14) most fire extinguishers were water-based rather than ABC extinguishers; (15) staff cheated on fire-preparation questionnaires; (16) staff conducted sham fire drills; (17) there was no automated fire-suppression system; (18) the smoke-ventilation exhaust systems were not operational; (19) smoke detectors were positioned too high;

(20) there were widespread problems with electrical outlets; (21) too few fire drills were conducted; (22) inmates were not provided storage containers with lids or covers; (23) staff failed to comply with recommendations made after the 2017 fire; (24) fire-safety equipment was not meaningfully inspected; and (25) staff were not properly questioned regarding their knowledge of fire-safety procedures. ECF 147-1 at 24-26.

In support of these arguments, Phillips states that he "has provided a panoply of evidence," yet only has citations for four of the listed conditions. *Id.* And those sparse citations are largely lacking or even contradict his assertions. For example, for his contention that there was no operational smoke ventilation exhaust system, he cites *Jenkins v. Bass*, 2025 WL 1916106 (N.D. Ind. July 10, 2025), *reconsideration denied*, 2025 WL 2982380 (N.D. Ind. Oct. 23, 2025). He states that *Jenkins*, which was also about a fire in the prison, made the supervisory defendants aware that the exhaust system was inoperable. ECF 145-1, 23. But that is not what *Jenkins* stated. *Jenkins,* 2025 WL 1916106 at *4. Much the opposite, the opinion granting summary judgment stated that the smoke was cleared "*using exhaust fans* and other fans brought to the unit." *Id.* at *2. At the summary judgment stage, I may disregard unsupported factual contentions and need not scour the record for any possible evidence that might be relevant to the plaintiff's contentions here. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572 (7th Cir. 2017) (holding that a court need not "scour the record in search of evidence to defeat a motion for summary judgment.").

Regardless, the question is not whether ISP could have done more; it is whether the supervisory defendants were deliberately indifferent to a substantial risk of serious

harm. Deliberate indifference requires more than negligence or even objective recklessness. *Stockton*, 44 F.4th at 615. An official who takes reasonable measures to address a known risk is not deliberately indifferent merely because additional precautions were available or the measures taken ultimately proved insufficient. *See Farmer*, 511 U.S. at 844 (an official who responds reasonably to a known substantial risk cannot be held liable under the Eighth Amendment even if the harm is not ultimately averted); *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023) (an official is not liable where the measures taken were "reasonably calculated" to address the risk, even though they ultimately failed to prevent the injury); *Bagola v. Kindt*, 131 F.3d 632, 647-48 (7th Cir. 1997) (officials who took reasonable steps to prevent harm were not deliberately indifferent even though they may have acted negligently or failed to eliminate the risk as quickly as possible). Thus, Phillips cannot establish deliberate indifference simply by identifying additional fire-safety measures that ISP could have implemented.

Here, although the measures taken by ISP did not prevent Phillips from being exposed to smoke, the undisputed evidence shows that the supervisory defendants took numerous steps "reasonably calculated" to address the risk posed by a fire. *See id.* Before the January 14 fire, ISP had: (1) established an on-site inmate fire department whose members received statewide firefighter certification; (2) repaired and replaced dampers, exhaust systems, fire alarms, and fire extinguishers as needed; (3) purchased updated firefighting equipment, including foam backpack fire-suppression systems and smoke-evacuation systems; (4) purchased additional water and ABC fire extinguishers;

(5) reduced the amount of property inmates could keep in their cells; (6) replaced plastic property boxes with more fire-resistant steel boxes; (7) upgraded its fire hydrants; (8) regularly inspected its fire extinguishers; (9) conducted fire drills four times per year; (10) implemented a Fire Plan governing fire prevention and evacuation; and (11) trained and tested staff on that plan.

Phillips lists various ways in which he believes these precautions were inadequate or could have been implemented more effectively. But as I noted above, the Eighth Amendment did not require the supervisory defendants to eliminate every conceivable fire hazard or adopt every additional precaution that might have reduced the risk further. The undisputed evidence instead shows a substantial system of fire-prevention, firefighting, evacuation, inspection, and training measures directed at the very risk Phillips contends the defendants ignored. That those measures did not prevent Phillips from suffering injury during the January 14 fire does not permit a reasonable jury to conclude that the supervisory defendants exhibited "a total unconcern" for his safety. Summary judgment is therefore warranted in favor of the supervisory defendants on this claim.

Accordingly, for these reasons, summary judgment is warranted in favor of all state defendants on both of Phillips's claims.

## II. Dr. Chico

Phillips is proceeding against Dr. Chico on an Eighth Amendment claim that she was deliberately indifferent to his need for medical care following the January 14 fire. ECF 8 at 11. Dr. Chico moves for summary judgment, arguing that the evidence does

not permit a reasonable jury to find that she was deliberately indifferent to any serious medical need. ECF 134; ECF 137.

Dr. Chico provides an affidavit in which she attests to the following facts: During all relevant times, Dr. Chico worked at ISP as a psychologist providing mental health services to inmates. ECF 135-1 at 1. She was not scheduled to work on January 14, 2023, but was called after the fire in ACH and asked to come to the prison to check on the inmates' mental health. *Id*. at 2. By the time she arrived, the fire had been extinguished. *Id*. Dr. Chico spent the next four or five hours walking each range of ACH and checking on each inmate, including Phillips. *Id*. She reminded inmates that she was available for mental health counseling, and several inmates who requested follow-up mental health treatment were scheduled for appointments. *Id*.

Because Dr. Chico is a psychologist rather than a medical doctor, she did not evaluate inmates for specific medical treatment during these rounds. ECF 135-1 at 2. If an inmate requested medical care, however, Dr. Chico attests that she recorded the inmate's cell location on a list and provided the list to custody staff so the inmate could be taken to the medical unit. *Id*. at 2-3. She did not have authority to personally escort inmates to the medical unit. *Id*. at 3. Dr. Chico does not specifically recall whether Phillips requested medical care when she spoke with him, but she attests that, if he did, she would have included his cell location on the list provided to custody staff. *Id*. She further attests that she observed no inmate displaying obvious signs of a medical emergency and believed that inmates who requested medical treatment would be taken

to the medical unit. *Id*. After completing her rounds and providing her list of cell locations to custody staff, Dr. Chico left the prison. *Id*.

For purposes of summary judgment, I accept Phillips' account that, when Dr. Chico saw him during her rounds, he told her that he had lost consciousness during the fire, struck his head, remained lightheaded, and was having difficulty breathing. ECF 145-1 at 3. Phillips was later evaluated by a medical provider at approximately 9:00 p.m. that day. ECF 132-1 at 74-77. He nevertheless argues that Dr. Chico was deliberately indifferent because she did not herself secure more immediate medical treatment.

Phillips first contends that Dr. Chico should have communicated his request directly to medical staff rather than providing the list of inmates requesting medical attention to custody staff. ECF 145-1 at 9. That conduct does not permit a reasonable inference of deliberate indifference. Dr. Chico attests that she provided the list to custody staff so those inmates could be taken to the medical unit for evaluation. ECF 135-1 at 3. The Eighth Amendment did not require her to personally perform every step necessary to secure treatment where she reasonably referred the matter to prison employees responsible for arranging access to the medical unit. *See Burks*, 555 F.3d at 595 ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). Providing Phillips' request for medical attention to custody staff therefore does not exhibit "a total unconcern" for his welfare.

Next, Phillips argues that Dr. Chico "failed to notify medical staff (or any other staff for that matter) of my need for medical attention, and instead rushed back home to continue enjoying her day off and entertaining her house guests." ECF 145-1 at 3. Dr.

Chico, however, attests that "[a]ll offender requests for medical treatment that were made to me were recorded and delivered to custody staff." ECF 135-1 at 3. Phillips has no personal knowledge of what Dr. Chico did after leaving his cell and therefore cannot contradict her testimony based on his own observations. He nevertheless argues that the circumstantial evidence creates a genuine dispute as to whether Dr. Chico actually provided the list of inmates requesting medical attention to custody staff. ECF 145-1 at 10-11. He relies on two grounds.

First, Phillips argues that the incident defendants' attestations that they were he unaware of his request for medical attention create a factual dispute as to whether Dr. Chico ever provided the list of cell locations to custody staff. ECF 145-1 at 10. But Dr. Chico does not identify which member of custody staff received the list, and there is no evidence that she provided, or was expected to provide, the list to any of the incident defendants specifically. The fact that those defendants were unaware of Phillips' request therefore does not contradict Dr. Chico's testimony that she provided the list to custody staff; she could have provided it to another custody employee who is not a defendant in this case.

Second, Phillips argues that, when he was eventually evaluated, the medical provider told him that she had not received any list from custody staff identifying inmates who needed medical attention. ECF 145-1 at 11. But Phillips's account of what the medical provider told him is an out-of-court statement offered to prove that no such list was received and therefore is inadmissible hearsay that cannot, standing alone, create a genuine dispute of material fact. *See Baines v. Walgreen Co.*, 863 F.3d 656, 662

(7th Cir. 2017). In any event, even if the statement were considered, it would not permit a reasonable jury to find Dr. Chico deliberately indifferent. Dr. Chico testified that she provided the list to custody staff so that custody staff could arrange for inmates to be taken to the medical unit; she did not testify that she personally delivered the list to any particular medical provider. Thus, the fact that the provider who ultimately evaluated Phillips had not received a list from custody staff would show, at most, that the list was not transmitted to that provider. It would not establish that Dr. Chico failed to provide the list to custody staff in the first instance, much less that she intentionally withheld Phillips's request or consciously disregarded his need for treatment. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) ("[T]he plaintiff must show that the defendant's actions or inaction caused the delay in his treatment."); *Barghouti v. Hansen*, No. 24-2610, 2026 WL 2169044, at *3 (7th Cir. July 28, 2026) (a subsequent delay in treatment did not establish who was responsible for the breakdown or that it resulted from deliberate indifference). Phillips's alleged conversation with the medical provider therefore does not create a genuine dispute as to Dr. Chico's conduct.

Moreover, even if a reasonable jury could infer that Dr. Chico failed to include Phillips' cell location on the list, there is no evidence that any such omission amounted to deliberate indifference rather than negligence. Nothing in the record suggests that Dr. Chico intentionally withheld Phillips' request, deliberately omitted him from the list, or otherwise consciously chose to prevent him from receiving medical care. Thus, even assuming some breakdown attributable to Dr. Chico occurred, the record would

permit only speculation as to whether it was inadvertent or reflected the culpable state of mind required for an Eighth Amendment violation.

Third, Phillips' same-day medical evaluation provides an additional reason his claim cannot proceed. To the extent the claim rests on Dr. Chico's failure to obtain treatment sooner, Phillips must present medical evidence that the delay itself caused him additional harm. *See Barnes*, 177 F.4th at 833-34. His eventual diagnosis and treatment, standing alone, are insufficient unless they assist a jury in determining that the delay worsened his condition. *Id.* (quoting *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007)).

Phillips has not produced such evidence. When he was evaluated around 9:00 p.m., the provider found elevated blood pressure and gave him Clonidine but did not diagnose any condition related to the fire. ECF 132-1 at 74-77. There is no evidence that the Clonidine promptly relieved his symptoms, that his blood pressure was elevated throughout the period of delay, or that earlier treatment would have changed his condition. That distinguishes *Williams*, where the medical records showed that nitroglycerin promptly relieved severe chest pain and lowered elevated blood pressure, permitting the jury to infer that the delay itself prolonged those conditions. 491 F.3d at 715-16. Here, the record does not permit a similar inference that any delay attributable to Dr. Chico exacerbated Phillips' condition or otherwise caused additional harm.

Accordingly, even accepting Phillips' testimony that he informed Dr. Chico of symptoms requiring medical attention, there is no nonspeculative evidence that Dr. Chico consciously disregarded that need or caused a harmful delay in treatment. The

only competent evidence addressing what she did after speaking with the inmates shows that she recorded requests for medical care and provided the resulting list to custody staff, and Phillips has produced no evidence from which a reasonable jury could find either that she failed to do so in his case or, even if she did, that the omission was anything more than negligent. Summary judgment is therefore warranted in Dr. Chico's favor.

For these reasons, the court:

(1) GRANTS the state defendants' motion for summary judgment (ECF 131);

(2) GRANTS Dr. Chico's motion for summary judgment (ECF 134); and

(3) DIRECTS the clerk to enter judgment in favor of the defendants and against Brandon A. Phillips, and to close this case.

**SO ORDERED**.

ENTERED: September 23, 2026.

/s/Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT